UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE FLASH MEMORY ANTITRUST LITIGATION<br><br>This Document Relates to All Actions. | Case No:  C 07-0086  SBA<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS DIRECT PURCHASER COMPLAINT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS INDIRECT PURCHASER COMPLAINT**<br><br>[Docket 370-374, 376, 379, 382, 454] |

This consolidated antitrust class action arises from an alleged horizontal price fixing conspiracy between various manufacturers, sellers and distributors of flash memory.  Flash memory is a type of electronic memory chip that has become commonplace in a variety of electronic products, such as USB drives, digital cameras, iPhones and similar products.  Two separate civil Complaints are pending.  The first is the Consolidated Direct Purchaser Class Action Complaint ("Direct Purchaser Complaint"), brought by those who purchased flash memory directly from Defendants.  The second is the Indirect-Purchaser Plaintiffs' Consolidated Class Action Complaint ("Indirect Purchaser Complaint"), filed by individuals and entities who purchased both stand-alone flash memory products and products that contain flash memory as a component.  Both Complaints allege violations of section 1 of the Sherman Act, 15 U.S.C. § 1.  The Indirect Purchaser Complaint also includes antitrust, consumer protection and equitable claims under the laws of various states.

The parties now are before the Court on: (1) the Motion by All Defendants to Dismiss Direct Purchasers' Sherman Act Claims (Docket 371); and (2) the Motion to Dismiss Indirect

Purchaser Plaintiffs' Consolidated Class Action Complaint (Docket 374).[1]  Having read and considered the papers submitted, and being fully informed, the Court DENIES Defendants' motion to dismiss the Direct Purchaser Complaint and GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss the Indirect Purchaser Complaint.

## I.   BACKGROUND

### A.   OVERVIEW OF THE DEVELOPMENT OF THE FLASH MEMORY MARKET

There are several types of memory used in or with electronic devices; most notably, flash memory, dynamic random access memory ("DRAM") and static random access memory ("SRAM").  Flash memory was initially developed in the 1980s by Defendant Toshiba.  (Direct Purchaser ("DP") Compl. ¶ 40.)[2]  Unlike DRAM and SRAM, flash memory is "non-volatile," meaning that no power is needed to maintain the information stored in the chip.  (Id. ¶ 39.)  The first generation of flash memory was known as NOR flash memory.  (Id.)  In 1987, Toshiba developed a second type of flash memory – NAND flash memory – which provided greater functionality at a lower cost.  (Id. ¶¶ 41-43.)  NAND flash memory is sold and marketed as a memory device, i.e., flash memory cards, USB drives, etc., and as a component part in other electronic devices, like Apple iPods or iPhones.  (Id.)

According to Plaintiffs, the NAND flash memory industry exhibits a number of characteristics that have facilitated the alleged conspiracy to control pricing.  (Id. ¶ 44.)  The NAND flash memory market is highly concentrated and is dominated by a "handful" of suppliers, i.e., Samsung, Toshiba, Renesas, Hynix and Micron.  (Id. ¶ 45.)  Over 90 percent of the worldwide market for flash memory is controlled by three companies, Samsung, Toshiba and Hynix.  (Id. ¶ 46.)  In addition, there are significant barriers to entry, as the cost to develop a modern NAND flash memory production facility can range from $4 to $5 billion.  (Id. ¶ 48.)  The flash memory

---

[1] Although Defendants have filed joint motions to dismiss, the following Defendants have filed their own motions to dismiss:  Sandisk (Docket 370); Hitachi (Docket 372); Renesas (373); Hynix (Docket 376); and Toshiba (Docket 382).

[2] These facts are taken from both the Direct Purchaser Complaint and Indirect Purchaser Complaint filed on February 7, 2008.  For purposes of the Background section, the references are to the Direct Purchaser Complaint only.

industry also is notable for its numerous cross-licensing and joint venture agreements that have spanned from the mid-1990s at least through the end of 2007.  (Id. ¶ 49.)  These agreements, along with the Defendants' participation in various trade associations and meetings, ostensibly have facilitated their ability to collude and control flash memory prices.  (Id. ¶ 50-59.)

### B.   COLLUSION IN THE MARKET FOR ELECTRONIC MEMORY

Apparent price fixing in the memory market has caught the attention of the United States Department of Justice ("DOJ") which has launched investigations into the DRAM and SRAM markets.  (Id. ¶¶ 60-65.)  In the DRAM matter, Hynix and Samsung, who also are Defendants in this case, have pleaded guilty to price fixing, and have paid fines in the amount of $300 million and $185 million, respectively.  (Id. ¶ 60.)  Defendants Hynix, Mitsubishi, Renesas, Samsung and Toshiba also are under investigation by the DOJ and/or are the subject of civil lawsuits relating to SRAM.  (Id. ¶ 62.)

Plaintiffs allege that the illegal pricing activity with respect to DRAM and SRAM is probative of and intertwined with Defendants' allegedly illegal activities in the market for NAND flash memory.  (Id. ¶¶ 65, 78.)  Like the DRAM/SRAM schemes, the purpose and goal of the conspiracy was to (a) coordinate pricing among competitors, (b) stabilize prices to ensure that they did not fall too low, and (c) raise prices when opportunities arose.  (Id. ¶¶ 72-74.)  In terms of its impact, the alleged conspiracy has artificially impacted prices for both NAND flash memory and products using such technology.  (Id. ¶¶ 75-77.)  As a commodity item, NAND flash memory is "highly price elastic" and subject to steep price declines as technology continues to advance.  (Id.)  Despite these market forces, manufacturers have been able to maintain their margins through artificially controlling the market.  (Id.)

In terms of overlap, Plaintiffs aver, *inter alia*, that the same employees of the Defendant companies (including those who pleaded guilty to criminal felonies in the DOJ's DRAM investigation) were responsible for pricing DRAM, SRAM and flash memory sold in the United States.  (Id. ¶¶ 67-69.)  These persons allegedly communicated with one another on a regular basis, which helped them to coordinate and control pricing across memory product lines.  (Id. ¶¶ 79-81.)  For instance, in 2001, the price for NAND flash memory, like DRAM pricing, experienced a

decline in demand.  (Id. ¶ 86.)  But through their continuing communications and contacts, in the next quarter Defendants were able to increase DRAM and NAND flash memory prices.  (Id.)  These "intercompetitor contacts" continued during the 2002 to 2006 time period, as evidenced by a number of emails from Samsung and other Defendants suggesting ways to maintain pricing.  (Id. ¶¶ 89, 91-95.)  Defendants allegedly continued their practice of entering into joint venture and cross-licensing agreements as yet another means to control the market.  (Id. ¶¶ 106-108.)

In or about September 2007, the DOJ confirmed that it was investigating potential antitrust violations with respect to the NAND flash memory market.  (Id. ¶ 116.)  Toshiba, Renesas and Samsung are among the entities that have received grand jury subpoenas in connection with the investigation.  (Id. ¶ 117.)

## C.   PROCEDURAL SUMMARY

Plaintiffs are individuals and entities who purchased NAND flash memory directly or indirectly from one or more Defendants from 1999 to the present (the "Class Period").  Defendants are alleged to have manufactured, sold, or distributed flash memory to customers throughout the United States during the Class Period.  (Id. ¶¶ 3-20.)  Plaintiffs allege Defendants and unnamed "coconspirators conspired to fix, raise, maintain and stabilize the price of NAND flash memory sold in the United States."  (Id. ¶ 1.)[3]

On February 7, 2008, Plaintiff Timothy Chanda filed a Consolidated Direct Purchaser Class Action Complaint ("Direct Purchaser Complaint") against the following Defendants: Samsung Electronics Company Ltd.; Samsung Semiconductor, Inc.; Hitachi, Ltd.; Renensas Technology Corporation; Renesas Technology America, Inc. (formerly known as Hitachi Semiconductor (America) Inc.; Hynix Semiconductor, Inc.; Hynix Semiconductor America, Inc.; Mitsubishi Electric Corporation; Mitsubishi Electric and Electronics USA, Inc.; SanDisk Corporation; Toshiba Corporation; Toshiba America, Inc.; and Toshiba America Electronic Components, Inc.  (Id. ¶¶ 3-

---

[3] On January 5, 2007, Plaintiff Trong Nguyen, on behalf of himself and others similarly situated, sued Defendants for violating section 1 of the Sherman Act, 15 U.S.C. § 1.  The Court later related and consolidated 23 cases with the Nguyen action.  The Court appointed interim lead counsel for the Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs on November 15, 2007. (Docket 256, 257.)

20.)  Plaintiffs allege that they purchased NAND flash memory from one or more of the Defendants.  (Id. ¶ 2.)  The Direct Purchaser Complaint alleges a single claim under section 1 of the Sherman Act.  (Id. ¶¶ 130-135.)

On the same date, Plaintiffs filed their Indirect Purchaser Complaint against essentially the same Defendants named in the Direct Purchaser Complaint.  (Docket 310, Indirect Purchaser ("IP") Compl. ¶¶ 50-66.)[4]  Indirect Purchasers are 33 individuals and entities who claim they purchased stand-alone NAND flash memory products (i.e., CompactFlash, SmartMedia, MultiMedia Card, Secure Digital Card, Memory Stick and USB flash drives) and products in which NAND flash memory is a substantial component.  (Id. ¶¶ 48-49.)

The Indirect Purchaser Complaint alleges four claims for relief:

(1) Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(2) Unjust Enrichment and Disgorgement of Profits under the laws of Arizona, Arkansas, California, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Rhode Island, South Dakota, Tennessee, West Virginia and Wisconsin;

(3) Violation of State Antitrust and Unfair Competition Laws of Alabama, Arizona, California, the District of Columbia, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, North Carolina, South Dakota, Tennessee, West Virginia and Wisconsin; and

(4) Violation of State Consumer Protection and Unfair Competition Laws of Arkansas, California, the District of Columbia, Florida, Hawaii, Kansas, Maine, Massachusetts, Nebraska, New Hampshire, Nevada, New Mexico, New York, North Carolina, Rhode Island and West Virginia.  (Id. ¶¶ 176-222.)

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.   To survive a motion to dismiss for failure

---

[4] The Indirect Purchaser Complaint adds Hitachi America, Ltd. and Hitachi Semiconductor America as defendants.  (Indirect Purchaser ("IP") Compl. ¶¶ 60-61.)

to state a claim, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what ... the claim is and the grounds upon which it rests."  Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (internal quotation marks omitted); Johnson v. Riverside Healthcare System, LP, 534 F.3d 1116, 1122 (9th Cir. 2008).[5]  "In general, the inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff."  Lazy Y Ranch Ltd. v. Behrens, 546 F.3d 580, 588 (9th Cir. 2008).

If dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment.  See Sparling v. Daou, 411 F.3d 1006, 1013 (9th Cir. 2005); Gompper v. VISX, Inc., 298 F.3d 893, 898 (9th Cir. 2002).  In resolving a motion to dismiss, a Court may take judicial notice, upon request, as provided by Federal Rule of Evidence 201, without transforming a motion to dismiss into one for summary judgment.  See MGIC Indem. Corp. v. Weisman, 803 F.2d 500, 503 (9th Cir. 1986).

## III.  DIRECT PURCHASER COMPLAINT

### A.  SUFFICIENCY OF THE CONSPIRACY ALLEGATIONS

The Sherman Act, section 1, states in part that, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  In Twombly, the Supreme Court held that a section 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made."  550 U.S. at 556.  That is, there must be enough facts presented "to raise a reasonable expectation that discovery will reveal evidence of illegal

---

[5] Two weeks after issuing Twombly, the Supreme Court clarified in Erickson that Twombly did not signal a switch to fact-pleading in the federal courts.  Erickson reaffirmed that under Rule 8 "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" 127 S.Ct. at 2200 (quoting Twombly, 550 U.S. at 555); see also Airborne Beepers & Video, Inc. v. AT&T Mobility LLC, 499 F.3d 663, 667-668 (7th Cir. 2007) ("[t]aking Erickson and Twombly together, we understand the Court to be saying only that at some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8.").

agreement."  Id.  "Asking for *plausible grounds* to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.  And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'"  Id. (emphasis added, footnote and citations omitted).

Defendants assert that allegations in the Direct Purchaser Complaint are too vague and conclusory to comport with the pleading requirements of Twombly.  As an initial matter, Defendants complain that the pleadings fail to allege the specific time, place, or person who had any meetings or communications regarding flash memory pricing or output.  (Docket 371, Mot. at 11.)  The Court disagrees.  Among other things, the pleadings identify the companies and/or individuals who were directly involved in setting prices for NAND flash memory.  (E.g., DP Compl. ¶¶ 68, 69, 81-85, 88-93, 103, 106.)  In particular, the Complaint alleges that many of the same employees in various companies (some of whom have pled guilty to price fixing in the DOJ's DRAM investigation) were responsible for setting prices for different types of memory, including DRAM/SRAM and flash memory.  (See id.)

In addition, the Complaint alleges the time frame of such alleged conduct, along with facts pertaining to the coordination of production as a means to control pricing.  (E.g, id. ¶¶ 86-88, 94, 96, 98, 101-105).[6]  For example, there are allegations of specific instances where output was reduced following meetings by Defendants - that, in turn, led to "implausible" price increases.  (Id.)  Similarly, the marketplace is alleged to have been conducive to coordinated pricing, as demonstrated by the existence of a concentrated market dominated by a few entities, with significant barriers to entry.  (See id. ¶¶ 45-59.)  Courts addressing analogous pleadings have concluded that these types of conspiracy allegations are sufficient to meet the pleading standards of Twombly.  E.g., In re Static Random Access Memory (SRAM) Antitrust Litig., 580 F. Supp. 2d 896, 901-02 (N.D. Cal. 2008) ("SRAM") ("general allegations of a conspiracy, price fixing and the

---

[6] The references to "Complaint" and "Plaintiffs" in this section refer to the Direct Purchaser Complaint and the Direct Purchaser Plaintiffs, respectively.

1  susceptibility of the SRAM market to such violations" sufficient under Twombly); In re TFT-LCD

2  (Flat Panel) Antitrust Litig., 586 F. Supp. 2d 1109, 1115 (N.D. Cal. 2008) ("TFT-LCD") (finding

3  that allegations that price stability in flat panel market was inconsistent with natural market forces

4  were sufficient to survive a motion to dismiss).  The Court finds that the facts alleged by Plaintiffs

5  are sufficient to give rise to "a plausible suggestion of conspiracy."  Twombly, 550 U.S. at 566.[7]

6          **B.**    **EXCHANGE OF INFORMATION BETWEEN COMPETITORS**

7       The Supreme Court has recognized the danger of collusion posed by the exchange of

8  pricing information.  Great Atlantic & Pacific Tea Co., Inc. v. F.T.C., 440 U.S. 69, 80 (1979); see

9  also United States v. U.S. Gypsum Co., 438 U.S. 422, 457 (1978) ("the most likely consequence of

10  any such agreement to exchange price information would be the stabilization of industry prices");

11  United States v. Container Corp., 393 U.S. 333, 337 (1969) ("[t]he inferences are irresistible that

12  the exchange of price information has had an anticompetitive effect in the industry, chilling the

13  vigor of price competition.").   Nevertheless, there is nothing inherently improper with competitors

14  communicating with one another.  See In re Baby Food Antitrust Litig., 166 F.3d 112, 126 (3d Cir.

15  1999) ("communications between competitors do not permit an inference of an agreement to fix

16  prices unless 'those communications rise to the level of an agreement, tacit or otherwise.'").

17  "Accordingly, information exchanges help to establish an antitrust violation only when either

18  (1) the exchange indicates the existence of an express or tacit agreement to fix or stabilize prices,

19  or (2) the exchange is made pursuant to an express or tacit agreement that is itself a violation of § 1

20  under a rule of reason analysis."   In re Coordinated Pretrial Proceedings in Petroleum Prods.

21  Antitrust Litig., 906 F.2d 432, 447 n.13 (9th Cir. 1990) ("Petroleum Prods.").

22

23      [7] In addition to the joint motion to dismiss, Toshiba, Mitsubishi, Hitachi, SanDisk and
Hynix filed their own, separate motions to dismiss.  The arguments adduced in those motions

24  overlap with those presented in the joint submission.  Their central point of contention appears to
be the lack of specific allegations directed at their particular company.  This argument fails.  For

25  pleading purposes, allegations of antitrust conspiracy need not be detailed on a "defendant by
defendant" basis.  See SRAM, 580 F. Supp. 2d at 903-907 (rejecting argument plaintiffs must

26  allege each defendant's specific role in an antitrust conspiracy); accord In re Fine Paper Antitrust
Litig., 685 F.2d 810, 822 (3rd Cir. 1982); In re Market-Makers Antitrust Litig., 894 F. Supp. 703,

27  712 (S.D.N.Y. 1995).  Defendant Hitachi America Ltd.'s separate argument that Plaintiff's claims
are time-barred is unsupported by any evidence which, in any event, would be impermissible on a

28  Rule 12(b)(6) motion.

Here, Defendants contend that the Plaintiffs' allegations concerning the exchange of information are too "ambiguous" and "sporadic" to suggest the existence of an agreement to fix prices.  They claim that the pleadings allege only "three discrete episodes over an eight-year period in which a non-defendant shared an unspecified snippet of 'flash' information…." (Mot. at 12.) That is not accurate.  The Complaint specifically alleges that Defendants routinely exchanged highly sensitive competitive information, including pricing and production data, to facilitate and monitor their price fixing conspiracy.  For example, the Complaint alleges that in August 1998, Samsung advised Hynix (both of which are alleged to be key market players) "that it would be attempting to raise memory prices 'across the board in September.'"  (Id. ¶¶ 46, 80).  Samsung also "reportedly told Hynix that it would '*coordinate with Japanese suppliers, asking them to raise, or at least not to lower from August prices*.'"  (Id. (emphasis added).)  Similarly, there are allegations that Micron and Samsung communicated with one another to discuss pricing and inventory on their respective products.  (Id. ¶ 82.)

More recent communications also support a plausible inference of an ongoing pattern of collusion.  In late 2001, Samsung's Vice President of Marketing sent an internal email to the various heads of the company's regional memory sales groups.  (Id. ¶ 86.)  The email instructed the recipients to contact their *competitors* to urge them that they "*must not retreat from the last quoted price*."  (Id. (emphasis added).) Separately, in 2001, officials from Hynix and Samsung met in Korea to ensure that they were "in the same boat with pricing."  (Id. ¶ 88.)  These types of contacts continued in the years that followed.  For instance, in early 2007, as prices for NAND memory continued to decline, Defendants were making efforts "to reduce NAND supply relative to expected demand growth."  (Id. ¶ 101.)  Thus, in March 2007, Samsung announced to industry analysts that it had stabilized "price erosion" as a result of "[s]upply constraints due to cautious supply[.]"  (Id. ¶ 102.)  Notably, Samsung emphasized its expectation that there would continue to be a "severe shortage" with inventories that, in turn, would bolster its margins.  (Id.)  In the absence of insider knowledge gleaned from communications with its competitors, Samsung allegedly "would have no way of making such a confident prediction."  (Id.)

Taken as a whole, these and similar allegations in the pleadings are sufficient to suggest

1  that Defendants routinely exchanged highly sensitive competitive information, including pricing

2  and production data, to facilitate and monitor their alleged price fixing conspiracy.  See SRAM,

3  580 F. Supp. at 902 (allegations regarding internal emails that discussed competitor's pricing were

4  germane in terms of meeting the Twombly standard); see also In re High Fructose Corn Syrup

5  Antitrust Litig., 295 F.3d 651, 662 (7th Cir. 2002) ("High Fructose") (documents discussing

6  coordination of pricing with competitors probative of price fixing); Flying J Inc. v. TA Operating

7  Corp., 2007 WL 3254765, *1 (D. Utah 2007) (price fixing agreement could be inferred from email

8  between competitors even if such an agreement was not discussed expressly).

9  **C.  MARKET CONCENTRATION**

10  "[T]he Sherman Act reflects an important federal policy in preventing excessive

11  concentration in relevant markets."  Gilmer v. Interstate/Johnson Lane Corp., 895 F.2d 195, 202

12  (4th Cir. 1990); Les Shockley Racing, Inc. v. National Hot Rod Ass'n, 884 F.2d 504, 510 (9th Cir.

13  1989).  "Significant market concentration makes it easier for firms in the market to collude,

14  expressly or tacitly, and thereby force price above or farther above the competitive level."  FTC v.

15  H.J. Heinz Co., 246 F.3d 708, 724 (D.C. Cir. 2001) (internal quotation marks omitted); Brooke

16  Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227 (1993) ("Tacit collusion ...

17  describes the process, not in itself unlawful, by which firms in a concentrated market might in

18  effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by

19  recognizing their shared economic interests and their interdependence with respect to price and

20  output decisions.").  On the other hand, market concentration and market shares are insufficient,

21  standing alone, to establish a Sherman Act violation.  See In re Late Fee and Over-Limit Fee Litig.,

22  528 F. Supp. 2d 953, 964 (N.D. Cal. 2007) ("Late Fee").

23  Defendants argue that "plaintiffs' market concentration allegations demonstrate that any

24  alleged 'parallel' conduct is at least as consistent with independent decision-making and vigorous

25  competition as with conspiracy."  (Id.)  Irrespective of whether that is correct, Defendants ignore

26  that Plaintiffs rely on more than mere allegations of high market concentration to show that the

27  flash memory market is prone to collusion.  Rather, in addition to market concentration, they allege

28  the existence of multiple and on-going business relationships, cross-licensing and joint venture

agreements, high barriers to entry, and homogeneity in products.  (E.g., DP Compl. ¶ 43, 44, 48, 49, 93, 106-107.)  When these allegations are considered in tandem, allegations of high market concentration can appropriately be relied upon as a factor to suggest price collusion.  SRAM, 580 F. Supp. 2d at 903 (denying motion to dismiss where market concentration allegations accompanied by allegations concerning an ongoing agreement to exchange price information for the purpose of stabilizing or increasing prices).  While Defendants' assertion that high market concentration was attributable to "independent decision-making and vigorous competition" ultimately may prove to be valid, the Court cannot resolve this issue on the merits at this juncture.

Defendants' secondary contention is that "rapidly shifting market shares" of the various Defendants exemplifies "vigorous competition."  (Mot. at 14.)[8]  In support, Defendants cite Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1318 (11th Cir. 2003), where the court noted that shifts in market share between competitors undermined a showing of collusion.  In reaching that conclusion, the court focused on the fact that "[t]hese sharp market share shifts were at least as great as those that occurred between 1980 and 1991, *an unquestionably competitive period*."  Id. (emphasis added).  This case is distinguishable, however.  Unlike Williamson, there is nothing in the pleadings that would enable the Court to make such comparisons.  Perhaps more fundamentally, Defendants' argument relies on inferences being drawn in *their* favor which, of course, is the antithesis of the standard of review applicable to a motion to dismiss.  Indeed, Williamson involved the review of a motion for summary judgment, not a motion to dismiss.

**D.   SUPPLY SHORTAGES**

Defendants next contend that the Complaint fails to allege any facts supporting an inference of an express agreement to limit the supply of NAND flash memory, and that the market forces of supply and demand – not collusion – explain the alleged supply shortages.  (Mot. at 14-16.)   In support of its argument, Defendants rely on In re Citric Acid Litig., 191 F.3d 1090, 1100-101 (9th Cir. 1999) ("Citric Acid"), where the court held that the defendant's failure to increase production

---

[8] The Court notes that the Complaint does not allege that market shares among the Defendants were "rapidly shifting."  That simply is Defendants' characterization of some of the data alleged in the pleadings.

1   more rapidly did not establish a price fixing conspiracy because "[t]he timing of this decision …

2   does not fit with [plaintiff]'s theory of the conspiracy."  Unlike <u>Citric Acid</u>, the Complaint in this

3   case alleges that the supply shortage was orchestrated by Samsung which, in turn, had the effect of

4   controlling prices in the time period that followed.  (<u>See</u> DP Compl. ¶¶ 94-98.)  Defendants also

5   overlook that <u>Citric Acid</u> involved a motion for summary judgment, not a motion to dismiss, where

6   Plaintiffs' allegations must be taken as true.  Thus, while the evidence adduced in the action

7   ultimately may support such a defense, the Court finds, as above, that such a determination is

8   premature at this juncture.

9          **E.    PRICE STABILITY**

10         "[R]ising prices do not themselves permit an inference of a collusive market dynamic.

11   Even in a concentrated market, the occurrence of a price increase does not in itself permit a rational

12   inference of conscious parallelism or supracompetitive pricing."  <u>See</u> <u>Brooke</u>, 509 U.S. at 237.

13   <u>Brooke</u> recognized that prices may rise due to market forces, and that it is entirely possible that

14   increases in price and output could occur simultaneously where there is "growing product

15   demand."  <u>Id.</u>  The Supreme Court noted that "[u]nder these conditions, a jury may not infer

16   competitive injury from price *and* output data absent some evidence that tends to prove that output

17   was restricted or prices were above a competitive level."  <u>Id.</u>

18         Defendants argue that "prices were not rising, but falling 'rapidly' as suppliers reduced

19   their costs and competition led those cost savings to be passed through to consumers, even as

20   demand for NAND flash memory experienced 'huge increases.'"  (Mot. at 17 (citing DP Compl.

21   ¶¶ 75-76.)  That is not an accurate characterization of the DP Complaint.  Plaintiffs allege that,

22   historically, memory manufacturers have been able to maintain their profit margins even as the

23   price of memory (on a per gigabit basis) declines.  (DP Compl. ¶ 76.)  They allege that such

24   "unnatural price stability" was the result of Defendants' "collusively agreeing to reduce or limit

25   capacity for the purpose of stabilizing or increasing prices."  (<u>Id.</u>)  Thus, even in times where there

26   was an oversupply of NAND flash memory, Defendants' conspiratorial conduct "caused those

27   prices to *decrease at a lesser rate* than would have been the case under competitive conditions.

28   (<u>Id.</u> ¶ 77.)  Given these allegations, <u>Brooke</u> is inapposite.

Separately, Defendants maintain that any fluctuations and or stability in the price for NAND flash memory is attributable to competitive market forces, as opposed to a collusive agreement among the Defendants to control the market.  (Mot. at 17.)  The authorities cited by Defendants, however, are inapposite.  In <u>In re Elevator Antitrust Litig.</u>, 502 F.3d 47 (2d Cir. 2007), the district court dismissed an antitrust complaint which relied entirely on parallel conduct, conclusory averments of conspiracy and references to a European investigation into price fixing.  In affirming the dismissal, the Second Circuit focused on (1) the failure to specify "any particular activities by any particular defendant," (2) non-specific allegations of parallel conduct, and (3) the lack of any facts establishing any possible nexus between the European conspiracy and any conduct in the United States.  <u>Id.</u> at 50.  In contrast, the pleadings herein provide much more detail regarding the intracompetitor communications directed at coordinating flash memory pricing and facts regarding the flash memory market structure showing its conduciveness towards collusive pricing schemes.  Likewise, facts are alleged regarding the overlap between the companion antitrust investigations in the DRAM/SRAM markets *and* the NAND flash memory market.

Defendants' reliance on <u>Late Fee</u> fares no better.  In that case, credit cardholders who paid excessive late fees and/or over-limit fees brought a class action against credit card issuers under section 1 of the Sherman Act.  The centerpiece of plaintiffs' claims was set forth in a single paragraph of the complaint which was comprised of a chart showing that several of the defendants charged the same or similar late fees.  <u>Late Fee</u>, 528 F. Supp. 2d at 962.  This Court concluded that the complaint was devoid of facts suggesting a preceding agreement, and the scant allegations showed nothing more than parallel conduct.  <u>Id.</u>  In contrast, the Complaint is far more detailed.  Here, Plaintiffs allege facts that the flash memory market is a highly concentrated with high barriers to entry – conditions that are conducive to a price fixing conspiracy.  (DP Compl. ¶¶ 44-48.)  In addition, it is alleged that Defendants exchanged highly sensitive competitive information (<u>id.</u> ¶¶ 78-114), and openly communicated with one another to "coordinate" pricing (<u>e.g.</u>, <u>id.</u> ¶¶ 80, 87, 88, 104.)  Lastly, unlike the allegations made in <u>Late Fee</u>, the Complaint in this case contains extensive, detailed allegations as to when, where and who engaged in at least some of the meetings that gave rise to the alleged conspiracy.  (<u>See id.</u> ¶¶ 66-114.)  These allegations easily satisfy the

1    notice pleading requirements of the Federal Rules and readily distinguish this case from the

2    conclusory allegations described in <u>Late Fee</u>.

3         F.    **JOINT VENTURES AND CROSS-LICENSING AGREEMENTS**

4         Plaintiffs allege that various Defendants entered into a "web" of cross-licensing and joint

5    venture agreements as a means to facilitate collusive behavior.  (DP Compl. ¶ 49.)  In their motion

6    to dismiss, Defendants contend that their joint ventures and cross-licenses are "unambiguously

7    procompetitive," especially given the high entry barriers to the flash memory market.  (Mot. at 18-

8    19.)  They further argue that the Plaintiffs fail to temporally link any joint ventures or cross-

9    licenses to any price changes and that, at most, they show nothing more than an "opportunity" to

10   conspire, and do not by themselves support an inference of collusion.  (<u>Id.</u>)  As a general

11   proposition, it is true that agreements between competitors may be entirely benign.  <u>See</u> <u>Texaco

12   Inc. v. Dagher</u>, 547 U.S. 1, 7 (2006).  That, however, does not necessarily support Defendants'

13   conclusion that the joint venture and cross-licensing agreements, as alleged in the pleadings, are

14   irrelevant for purposes of the instant motions to dismiss.

15        The Ninth Circuit has aptly observed that "direct evidence will rarely be available" to prove

16   the existence of a price fixing conspiracy.  <u>See</u> <u>Petroleum Prods.</u>, 906 F.2d at 439.  It is for that

17   reason that "circumstantial evidence is the lifeblood of antitrust law."  <u>U.S. v. Falstaff Brewing

18   Corp.</u>, 410 U.S. 526, 534 n.13 (1973).  In this case, the allegations regarding Defendants'

19   participation and use of joint venture and cross-licensing agreements go beyond merely alleging

20   that Defendants' joint ventures, licensing agreements and other business affiliations simply

21   fostered an "opportunity" to collude.  To the contrary, Plaintiffs alleged that such agreements were

22   used as the means to maintain and achieve the end result of the conspiracy by controlling the

23   supply, and thereby permitting increases in the price for the products.   (DP Compl. ¶¶ 49-59, 93-

24

25

26

27

28

1   94, 106-07.)[9]  While these allegations may not expressly state that the agreements themselves were

2   illegal, they nonetheless may be considered with the pleadings as a whole in determining the

3   existence of a "plausible" conspiracy.  See High Fructose, 295 F.3d at 662 (noting that

4   "ambiguous" evidence should be considered in antitrust claims because "most cases are

5   constructed out of a tissue of such statements and other circumstantial evidence").

6       G.     TRADE SHOWS AND TRADE ASSOCIATION MEETINGS

7           The Complaint alleges that "Defendants belong to a web of different trade associations and

8   participate in various industry trade shows, all of which provide forums at which they can collude

9   to fix prices and limit capacity for NAND flash memory."  (DP Compl. ¶ 50.)  One such

10  association is the Compact Flash Association ("CFA"), in which Defendants Samsung, Toshiba,

11  Hitachi, Mitsubishi and SanDisk all are members.  (Id. ¶ 51.)  The CFA allegedly holds regular

12  meetings and participates in trade shows throughout the world.  (Id. ¶ 52.)  Plaintiffs assert that

13  these meetings and trade shows provide a vehicle for the "cartel's members" to communicate

14  regularly to "facilitate the development of a conspiracy."  (Id. ¶ 59.)  In response, Defendants claim

15  that their membership in a trade association is presumptively legitimate and that their attendance at

16  such industry meetings and events generally does not establish illegal collusion.

17          Generally, there is nothing particularly nefarious in attending industry functions.  See In re

18  Graphics Processing Units Antitrust Litig., 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) ("GPU

19  I").  Nor is there anything necessarily improper with their participation or membership in industry

20  trade associations.  See Citric Acid, 191 F.3d at 1098.  Indeed, trade associations serve a beneficial

21  and legitimate function.  See McDaniel v. Appraisal Institute, 117 F.3d 421, 424 (9th Cir. 1997).

22

23          [9] For example, the Complaint alleges that as early as 2002, industry participants called for
    cooperation among competitors to "prevent a price war," and that Defendants heeded these

24  suggestions.  (DP Compl. ¶¶ 91-92.)   It further is alleged that consistent with this strategy, Renesas
    was created in 2003 as a joint venture by Defendants Hitachi, Ltd. and Mitsubishi.  (Id. ¶ 64.)  It

25  thus is plausible to conclude that the formation of Renesas was itself a conspiratorial act to control
    prices and supply.  See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d

26  1224 (3rd Cir. 1993) (noting that a range of circumstantial evidence can show collusion; "'[f]or
    example, have they attended meetings or conducted discussions at which they had the opportunity

27  to conspire; have they acted against their own economic best interests; have they engaged in
    parallel behavior that is economically irrational unless an agreement exists; has at least one

28  participant expressly invited common action by the other'") (emphasis added).

- 15 -

That notwithstanding, courts have recognized that trade association affiliations and attendance at industry events may be alleged to show that putative conspirators had the opportunity and means to develop and/or further their alleged collusive scheme.  See Todd v. Exxon Corp., 275 F.3d 191, 213 (2d Cir. 2001) ("the frequency of the meetings is itself problematic for the same reason that the exchange of current price data is suspect:  It tends to facilitate the policing of price conspiracies."). And while "these allegations cannot alone support Plaintiffs' claims, [] such participation demonstrates *how and when* Defendants had opportunities to exchange information or make agreements."   SRAM, 580 F. Supp. at 903 (emphasis added).

The Court also disagrees with Defendants that dismissal is warranted on the ground that Plaintiffs fail to identify "who attended these meetings, what was discussed at them, or how they purportedly related to the conspiracy other than providing an opportunity for the parties to talk to one another…."  (Mot. at 20.)  Not only do Defendants fail to assert any authority in support of their contention that this level of specificity - akin to Rule 9(b) - is required, their argument is inconsistent with the Supreme Court's holding that "[s]pecific facts are not necessary" at the pleading stage.  See Erickson, 127 S.Ct. at 2200.  Twombly merely requires enough facts in the complaint as a whole to "nudge [plaintiffs'] claims across the line from conceivable to plausible." 550 U.S. at 570.  Thus, while Plaintiffs' allegations regarding trade organizations and trade meetings, *standing alone*, may not state a claim under the Sherman Act, they may properly be considered along with the other allegations in the Complaint as discussed above for purposes of the assessing the sufficiency of the Complaint.  See SRAM, 580 F. Supp. at 903.

### H.   RELATIONSHIP BETWEEN DRAM/SRAM AND FLASH MEMORY CONSPIRACIES

Plaintiffs posit that the Defendants' alleged conspiracy to manipulate pricing for NAND flash memory was modeled after their pricing schemes in the markets for DRAM and SRAM memory, which are the subject of DOJ investigations.  (DP Compl. ¶ 71.)  According to Defendants, the DRAM/SRAM investigations are irrelevant for purposes of establishing a conspiracy regarding NAND flash memory on the ground that Plaintiffs have failed to establish a nexus between the DRAM/SRAM pricing schemes and the alleged conspiracy to control the price of NAND flash memory.  (Mot. at 21.)

In <u>United States v. Andreas</u>, 216 F.3d 645 (7th Cir. 2000), the court recognized that evidence concerning a prior conspiracy may be relevant and admissible to show the background and development of a current conspiracy.  In <u>Andreas</u>, the court addressed a claim that there was a conspiracy to fix prices and control the output of Lysine, an amino acid.  On appeal, the court rejected defendants challenge to the admissibility of evidence concerning a similar scheme involving the related market for citric acid.  The court found that there was evidence that the citric acid scheme "provided the blueprint for and motivating force behind the nascent lysine scheme," and thus, was admissible to provide context as to how the lysine conspiracy operated.  <u>Id.</u> at 665; <u>see also</u> <u>High Fructose</u>, 295 F.3d at 661 (same).  Likewise, in <u>SRAM</u>, the district court acknowledged that "[a]lthough the DRAM guilty pleas are not sufficient to support Plaintiffs' clams standing on their own, *they do support an inference of a conspiracy in the SRAM industry.*" 580 F. Supp. 2d at 903 (emphasis added).

Defendants ignore the above authority, and instead, focus on the fact that the employees who pleaded guilty to price fixing in the DRAM investigation worked for only *two* of the Defendant companies.  (Mot. at 21-22, Reply at 12-13.)  While that may be so, the Court notes that the two companies involved, Samsung and Hynix, collectively controlled the *majority* of the flash memory market *and* together paid fines approaching half a billion dollars.  (DP. Compl. ¶¶ 68, 69, 46.)  In addition, at least seven of the employees involved are alleged to have had responsibility for NAND flash memory pricing, sales, marketing and operations in the United States.  (<u>Id.</u> ¶ 67-69.)[10] Given these employees' overlapping involvement in controlling DRAM and flash memory pricing, coupled with the significant market power wielded by their employers, it is reasonable to infer that their involvement in the DRAM conspiracy had at least some connection to the alleged conspiracy in this case.

Defendants also attempt to distinguish the two conspiracies by claiming, inaccurately, that the DRAM case involved raising prices, while this case involves restricting supplies.  (Mot. at 22.) In fact, the Complaint expressly alleges that "Defendants and their co-conspirators conspired to *fix,*

_____

[10] It also is noteworthy that nearly all of the Defendants in this case sell DRAM and NAND flash memory.  (DP Compl. ¶ 66-69.)

*raise, maintain and stabilize the price of NAND flash memory sold in the United States....*"  (DP Compl. ¶¶ 1, 33 (emphasis added).)  Similarly, Plaintiffs allege that Defendants specifically discussed controlling prices with regard to all memory products.  (Id. ¶¶ 79-80, 82, 84-85, 87-88, 102.)  But even if the flash memory scheme focused more on affecting output, the fact remains that the purpose of both conspiracies was to artificially control and impact the memory market in order to generate or preserve profits.  At bottom, while these facts may not *prove* the existence of a conspiracy with respect to NAND flash memory, they are properly pleaded for the purpose of establishing the plausibility that such a conspiracy existed.[11]

### I.  SUMMARY

The Court concludes that the Complaint alleges "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 576.  Defendants' motion to dismiss the Direct Purchaser Complaint is therefore DENIED.

## IV.  INDIRECT PURCHASER COMPLAINT

### A.  OVERVIEW

Separate and apart from the Direct Purchaser Complaint, 33 individuals and entities have filed an Indirect Purchaser Complaint, which also is the subject of a joint motion to dismiss. Unlike the Direct Purchasers, the Indirect Purchasers' claims are "limited in scope to NAND Flash Memory purchased indirectly where NAND Flash Memory is entirely a stand-alone product or a substantial component of another product...."  (IP Compl. ¶ 12.)  Examples of such products include flash memory cards, USB flash drives, flash-based digital music players (i.e., iPods, etc.) and higher end mobile telephones and computing devices.  (Id.)

---

[11] In their Complaint, Plaintiffs allege that the Department of Justice ("DOJ") has begun investigating Defendants for price-fixing *flash* memory.  (DP Compl. ¶¶ 115-118.)  Plaintiffs suggest that this development may be used to create an inference of anti-competitive activity. However, as noted by Defendants, the mere fact that an investigation is under way is not by itself an appropriate consideration for purposes of determining the adequacy of the pleadings.  See SRAM, 580 F. Supp. 2d at 903 ("The Court agrees that the existence of the investigation [regarding SRAM] does not support Plaintiffs' antitrust conspiracy claims"); GPU, 527 F. Supp. 2d at 1024 (finding that it would be sheer speculation to infer anti-competitive behavior from a mere investigation, as opposed to a proceeding which results in charges or civil or criminal penalties).

Defendants' motion to dismiss presents five central arguments:  (1) Plaintiffs fail to satisfy pleading requirements of Twombly; (2) Plaintiffs lack standing to assert state law antitrust claims; (3) Plaintiffs' consumer protection claims fail as a matter of law; (4) Plaintiffs cannot plead a claim for unjust enrichment alongside claims that seek a remedy at law; and (5) Plaintiffs lack standing to assert claims under the laws of states where none of them resides.  Defendants' arguments regarding Twombly fail for the reasons discussed *supra* in the section of this Order analyzing the motion to dismiss the Direct Purchaser Complaint.  As to the remaining four grounds for dismissal, the Court discusses them seriatim.[12]

### B.   STANDING TO PURSUE STATE ANTITRUST CLAIMS

#### 1.   Applicability of the AGC Standard

In Illinois Brick Company v. Illinois, 431 U.S. 720, 730 (1977), the Supreme Court held that indirect purchasers generally may not sue for money damages under Section 4 of the Clayton Act.  In response to Illinois Brick, a number of states passed "repealer" statutes which expressly allow indirect purchasers to recover money damages for antitrust violations under state law.  See California v. ARC Am. Corp., 490 U.S. 93, 97-98 (1989).  In the present case, Plaintiffs' third claim for relief for state antitrust violations is predicated on the repealer statutes of Alabama, Arizona, California, the District of Columbia, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, North Carolina, South Dakota, Tennessee, West Virginia and Wisconsin.  (IP Compl. ¶¶ 187-205.)

In their motion to dismiss, Defendants contend that Plaintiffs lack standing to bring state antitrust claims on the ground that they cannot meet the requirements set forth in Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519 (1983) ("AGC").[13]  "[T]he Supreme Court in [AGC] identified certain factors for determining

---

[12] All references to "Plaintiffs" and "Complaint" in this section are to the Indirect Purchaser Plaintiffs and the Indirect-Purchaser Plaintiffs' Consolidated Class Action Complaint, respectively.

[13] It bears noting that the Indirect Purchasers Plaintiffs are comprised of those who purchased (1) flash memory as a "stand-alone product' and (2) products where flash memory is a "substantial component" of a finished product.  (IP Compl. ¶ 12.)  Defendants' motion to dismiss is limited specifically to the latter category, i.e., "Flash Memory-based products."  (Mot. at 12.)

1   whether a plaintiff who has borne an injury has antitrust standing.  These factors include:  (1) the

2   nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were

3   intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm;

4   (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages."  American

5   Ad Mgmt., Inc. v. General Tel. Co. of Cal., 190 F.3d 1051, 1054 (9th Cir. 1999) (citing AGC, 459

6   U.S. at 535).  "To conclude that there is antitrust standing, a court need not find in favor of the

7   plaintiff on each factor."  Id.  Instead, courts are to balance the factors, "giving great weight to the

8   nature of the plaintiff's alleged injury."  Id.

9        The threshold question presented with regard to the issue of standing is whether AGC, the

10   standard for determining standing under federal antitrust claims also applies to antitrust claims

11   predicated on state law.  Resolution of that question is predicated on state law.  In analyzing

12   questions of state law, federal courts are bound by the decisions of the state's highest court.  See

13   United Broth. of Carpenters and Joiners of America Local 586 v. N.L.R., 540 F.3d 957, 963 (9th

14   Cir. 2008) ("Carpenters").  It is settled that "[w]here the state's highest court has not decided an

15   issue, the task of the federal courts is to predict how the state high court would resolve it."

16   Dimidowich v. Bell & Howell, 803 F.2d 1473, 1482 (9th Cir. 1986) (as amended).  If "there is

17   relevant precedent from the state's intermediate appellate court, the federal court must follow the

18   state intermediate appellate court decision unless the federal court finds convincing evidence that

19   the state's supreme court likely would not follow it."  Ryman v. Sears, Roebuck and Co., 505 F.3d

20   993, 994 (9th Cir. 2007) (emphasis omitted).  Relevant decisions of courts in other jurisdictions

21   also should be considered.  See Giles v. General Motors Acceptance Corp., 494 F.3d 865, 872 (9th

22   Cir. 2007).

23        Defendants summarily argue that AGC governs the standing inquiry to Plaintiff's state

24   antitrust claims under Arizona, California, Iowa, Kansas, Maine, Michigan, Nebraska, North

25   Carolina, South Dakota, Mississippi, Nevada, New Mexico, West Virginia, Wisconsin law.  (Mot.

26   at 17.)  The Court concurs with Defendants only with respect to Iowa, Nebraska and California.

27   The highest courts in both Iowa and Nebraska have held that the AGC factors apply to their

28   antitrust laws.  Southard v. Visa USA, Inc., 734 N.W.2d 192, 198-99 (Iowa 2007); Kanne v. Visa

1   U.S.A., Inc., 723 N.W.2d 293, 302-03 (2006).  As such, the Court is compelled to find that AGC

2   applies to Indirect Plaintiffs' antitrust claims based on Iowa and Nebraska law.  See Carpenters,

3   540 F.3d at 963.  As to California, its Supreme Court has not reached this issue, but at least one of

4   its intermediate appellate courts has applied these factors to its antitrust law, the Cartwright Act,

5   Cal. Bus. & Prof. Code § 16720 et seq.  See Vinci v. Waste Mgmt., Inc., 36 Cal.App.4th 1811,

6   (1995); Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 987 (9th Cir. 2000).  Accordingly,

7   the Court finds that AGC applies to Plaintiffs' California law antitrust claims as well.  See Ryman,

8   505 F.3d at 994 (holding that intermediate appellate court decisions generally are binding).

9           The Court disagrees that AGC applies to any of remaining states in dispute.  With respect to

10  Arizona, Nebraska, Nevada, New Mexico, South Dakota and West Virginia, there are no state

11  court appellate decisions or compelling decisions from other jurisdictions to provide this Court

12  with guidance on how to "predict" how the highest court of each state would rule on this issue.  See

13  Dimidowich, 803 F.2d at 1482.  However, Defendants note that each of these states has

14  harmonization provisions calling for their respective statutes to be construed in accordance with

15  federal law.  See Ariz.Rev.Stat. Ann. § 44-1412 ("in construing this article, the courts may use as a

16  guide interpretations given by the federal courts to comparable federal antitrust statutes");

17  Neb.Rev.Stat. § 59-829 ("the courts of this state in construing [Nebraska's antitrust statute] shall

18  follow the construction given to the federal law by the federal courts"); Nev.Rev.Stat. § 598A.050

19  ("The provisions of this chapter [under Nevada law] shall be construed in harmony with prevailing

20  judicial interpretations of the federal antitrust statutes"); N.M. Stat. Ann. § 57-1-15 ("the [New

21  Mexico] Antitrust Act shall be construed in harmony with judicial interpretations of the federal

22  antitrust laws"); S.D. Codified Laws § 37-1-22 ("It is the intent of the [South Dakota] Legislature

23  that in construing this chapter, the courts may use as a guide interpretations given by the federal or

24  state courts to comparable antitrust statutes."); W.Va. Code § 47-18-16 ("This [West Virginia]

25  article shall be construed liberally and in harmony with ruling judicial interpretations of

26  comparable federal statutes").

27          As to Kansas, Maine, Michigan, Mississippi, North Carolina, South Dakota and Wisconsin,

28  the Court has not been directed to any pertinent court decisions or any harmonization provisions, as

1    in the case of the other states at issue.  However, Defendants focus the Court's attention on cases

2    purporting to demonstrate that states interpreting their antitrust laws look to federal antitrust

3    precedents for guidance.  See Orr v. Beamon, 77 F. Supp. 2d 1208, 1212 (D. Kan. 1999) ("standing

4    under the Kansas antitrust statutes requires an antitrust injury similar to that required under the

5    Sherman and Clayton Acts"); Davric Maine Corp. v. Rancourt, 216 F.3d 143, 149 (1st Cir. 2000)

6    ("We have noted that the 'Maine antitrust statutes parallel the Sherman Act,' and thus have

7    analyzed claims thereunder according to the doctrines developed in relation to federal law."); First

8    Med Representatives, LLC v. Futura Med. Corp., 195 F. Supp. 2d 917, 922 (E.D. Mich. 2002)

9    ("Michigan courts apply Sherman Act analysis to the [Michigan Antitrust Reform Act]"); Pope v.

10   Mississippi Real Estate Com'm, 872 F.2d 127, 129 (5th Cir. 1989) (combining analysis of

11   Mississippi and federal antitrust claims); Rose v. Vulcan Materials Co.,194 S.E.2d 521, 530 (1973)

12   ("the body of law applying the Sherman Act, although not binding upon this Court in applying

13   [North Carolina's antitrust law], is nonetheless instructive in determining the full reach of that

14   statute."); State v. Waste Mgmt. of Wis., Inc., 261 N.W.2d 147, 155 (1978) ("Except for the fact

15   that the state act applies to intrastate commerce while the federal act applies to interstate

16   commerce, what amounts to a conspiracy in restraint of trade under the Sherman Act amounts to a

17   conspiracy in restraint of trade under the Wisconsin antitrust act.").

18          With little reasoning or analysis, Defendants urge the Court to follow DRAM I, where the

19   court found the existence of harmonization provisions and/or judicial reference to federal antitrust

20   precedents to interpret state antitrust statutes as a sufficient basis on which to trigger application of

21   AGC.  (Mot. at 8.)  This Court, however, is reticent to adopt an across-the-board rule that a state's

22   harmonization provision, whether created by statute or common law, is an appropriate means of

23   predicting how a state's highest court would rule regarding the applicability of AGC to state law

24   antitrust claims.  Neither party has provided the Court with the requisite, individualized analysis on

25   a per state basis to enable the Court to render such a determination.  As a consequence, "this order

26   declines to undertake the back-breaking labor involved in deciphering the state of antitrust standing

27   in each of those states on this motion - particularly since, as shown below, indirect purchasers have

28   shown standing under AGC for consumers who bought finished [flash memory products]."  See

1   GPU I, 540 F. Supp. 2d at 1097.  Thus, the Court concludes that AGC's standing analysis applies

2   only to Plaintiffs' state antitrust claims based on California, Iowa and Nebraska law.

3              **2.        Application of the AGC Factors to Plaintiffs' Antitrust Claims Under
                            California, Iowa and Nebraska Law**

4

5                      *a)        Nature of the Injury*

6          The first factor under AGC is whether the injury alleged by Plaintiffs is the type the

7   antitrust laws are intended to prevent.  See American Ad Mgt., 190 F.3d at 1055.  "A plaintiff may

8   only pursue an antitrust action if it can show antitrust injury, which is to say 'injury of the type the

9   antitrust laws were intended to prevent and that flows from that which makes defendants' acts

10  unlawful.'"  DRAM I, 516 F. Supp. 2d at 1089 (quoting American Ad Mgmt., 190 F.3d at 1055).

11  "The requirement that the alleged injury be related to anti-competitive behavior requires, *as a*

12  *corollary*, that the injured party be a participant in the same market as the alleged malefactors."

13  Bhan v. NME Hosps., Inc., 772 F.2d 1467, 1470 (9th Cir. 1985) (emphasis added); see also Tanaka

14  v. University of Southern Calif., 252 F.3d 1059, 1063 (9th Cir. 2001) (the anticompetitive effects

15  must be felt in the "relevant market").  To determine whether an injured plaintiff is indeed a market

16  participant, "the focus is upon the reasonable interchangeability of use or the cross-elasticity of

17  demand" between the product or services involved.  Bhan, 772 F.2d at 1470-71.

18         In this case, Plaintiffs contend that they were injured by "paying higher prices for products

19  containing NAND Flash Memory than they would have in the absence of Defendants' conspiracy."

20  (IP Compl. ¶ 148; Opp'n at 23.)  Defendants do not dispute that this is the type of injury that

21  antitrust laws were intended to protect against.  See American Ad Mgt., 190 F.3d at 1055.  Rather,

22  Defendants' central contention is that Plaintiffs cannot show that they are "participants" in the

23  restrained market.  (Mot. at 9-10.)  More specifically, Defendants assert that the alleged

24  anticompetitive conduct occurred only in the market for *direct* purchasers of NAND flash memory,

25  which is different than for *indirect* purchasers where the relevant market ostensibly is defined by

26  where the particular product containing flash memory is sold.  (Mot. at 9-10.)

27         The argument posited by Defendants was rejected in GPU I, F. Supp. 2d at 1098.  In that

28  case, direct and indirect purchasers brought federal and state antitrust claims against producers of

1   graphics processing units ("GPUs").  GPUs are devices used in computers, servers, work stations,

2   gaming consoles and mobile communication devices.  Direct purchasers alleged that they

3   purchased GPUs directly from manufacturers, while indirect purchasers alleged they purchased

4   finished products that contained GPUs.  Defendants moved to dismiss the indirect purchasers'

5   claims on the ground that they were not participants in the relevant market because they

6   "participated" in the market for the finished product containing GPUs, as opposed to the market for

7   GPUs themselves.  Id.  The court rejected that distinction, however, noting that GPUs "are separate

8   components of a computer and that any costs attributable to them are traceable through the chain of

9   distribution."  Id.

10      The court in TFT-LCD applied similar reasoning in a class action involving thin film

11  transfer liquid crystal display ("LCD") panels and products.  586 F. Supp. 2d at 1123.  As in GPU

12  I, the defendant manufactures argued that the indirect plaintiffs could not be considered

13  participants in the relevant market for LCDs, since they purchased finished products containing

14  LCD panels.  The court found the alleged distinction to be uncompelling in view of the plaintiffs'

15  allegations that the market for LCD panels and the market for the products into which the panels

16  are placed are "inextricably linked and intertwined," and as a result, the demand for LCD panels

17  directly derives from the demand for such products in which it is used as a component.  Id.  The

18  court added that "there are factual questions about the relevant market," such as whether the

19  indirect purchaser plaintiffs actually participated in the market for LCD panels through their

20  purchases of products containing such panels or whether that market was "analytically distinct"

21  from the market for LCD panels.  Id.  In either event, the court concluded that "plaintiffs'

22  allegations are sufficient at this stage to weigh in favor of standing under the first factor of AGC."

23  Id.

24      As in GPU I and TFT-LCD, Plaintiffs have alleged sufficient facts that they, as Indirect

25  Purchasers of NAND flash memory-based products, are in the "same market" as Direct Purchasers,

26  at least as far as antitrust standing is concerned at this stage of the proceedings.  The Complaint

27  alleges that NAND flash memory has a variety of applications.  It can be purchased as a stand-

28  alone item or incorporated as a central component of finished products, such as digital music

1    players, USB drives, and so on.  (IP Compl. ¶ 73.)  Regardless of how it is sold, however, NAND

2    flash memory provides essentially the same functionality; that is, versatile, digital storage that is

3    *not* dependent on the presence of power to maintain its memory.  (Id. ¶¶ 71-72.)  Thus, while the

4    markets for NAND flash memory and products that contain NAND flash memory technically may

5    be different, in practice, both markets are inextricably intertwined and there is inherent cross-

6    elasticity of demand between the two.  (Id. ¶ 73.)  For purposes of the instant motion to dismiss,

7    Plaintiffs have alleged sufficient facts to show that they are market participants for purposes of

8    AGC.  However, it bears noting that the actual determination of whether indirect purchasers are

9    "participants" in the same "relevant market" for purposes of antitrust standing is better suited to

10   resolution upon a fuller record.  See TFT-LCD, 586 F. Supp. 2d at 1123.

**b)      *The Directness of the Injury***

12       "The second [AGC] factor looks to whether [the] alleged injury was the direct result of

13   [defendants'] allegedly anticompetitive conduct.... To assess the directness of this injury, we look

14   to the chain of causation between [the] injury and the alleged restraint in the market[.]"  Am. Ad

15   Mgt., 190 F.3d at 1058.  Defendants contend that there is no direct injury because NAND flash

16   memory is merely a component of the finished product, and is but one of many variables affecting

17   its price.  (Mot. at 13.)  They also claim that the distribution channels for finished products differ

18   from those for NAND flash memory.  (Id.)

19       In TFT-LCD and GPU I, the courts found that indirect purchasers of components had

20   satisfied their burden of pleading directness of injury by alleging that the cost of the component

21   was traceable through the product distribution chain.  Compare TFT-LCD, 586 F. Supp. 2d at 1123

22   (directness requirement met based on allegations that cost of component part comprised a

23   substantial amount of the finished product cost and could be traced through the distribution chain);

24   GPU I, 540 F. Supp. 2d at 1098 (same) with DRAM I, 516 F. Supp. 2d at 1092 (directness

25   requirement not met where the "complaint sets forth no allegations that, within the final purchase

26   price of a given product purchased by plaintiffs for 'end use,' the ultimate cost of DRAM is

27   somehow directly traceable or distinguishable").

28       In this case, the Complaint expressly alleges that "[w]hen NAND Flash Memory is

- 25 -

purchased by consumer as part of an electronic device, it is a distinct, physically-discrete hardware element of the end-use product and is identifiable by a specific, discrete part or model number that permits tracing.  NAND Flash Memory is identifiable and traceable throughout the chain of the distribution to the end user. It does not undergo any alterations as it moves through the chain of distribution."  (IP Compl. ¶ 152.)  The pleadings further allege that "[t]racing can help show that changes in the prices paid by direct purchasers of NAND Flash Memory affect prices paid indirect-purchasers of the Flash Memory itself or products containing Flash Memory."  (Id. ¶ 154.)   In addition, NAND Flash Memory allegedly "makes up an overwhelming majority of the cost of NAND flash-based memory devices and a substantial portion of the consumer devices in which NAND Flash Memory is packaged to be sold as a component."   (Id. ¶ 157.)  These allegations are adequate to show that there is a chain of causation between Defendants' allegedly anticompetitive conduct and Plaintiffs' injury, which is the overpayment for flash memory products and finished products containing NAND flash memory.

**c)**   ***Speculative Nature of Harm and Complexity in Apportioning Damages***

The final third and fifth AGC factors - the speculative nature of the harm and the complexity in apportioning damages - may be considered together.  See DRAM I, 516 F. Supp. 2d at 1092 (citing American Ad Mgmt, 190 F.3d at 1054-55).  As to these factors, Defendants make essentially the same arguments that they raised regarding AGC's second factor; namely, that NAND flash memory is just one of many components of a finished product, and as such, any attempt to distinguish the impact of its allegedly inflated price on the purchase price of a retail product would be speculative and excessively complex.  (Mot. at 13-15.)  As discussed above, Plaintiffs have alleged that the NAND flash memory, whether in the form of a product or as a component of a finished product, remains discrete and traceable to its manufacturer.  This is sufficient for purposes of avoid dismissal.  See DRAM I, 516 F. Supp. 2d at 1092-93.

**d)**   ***Duplicative Recovery***

"The risk to be avoided under [the duplicative recovery factor] is that potential plaintiffs may be in a 'position to assert conflicting claims to a common fund . . . thereby creating the danger

1   of multiple liability for the fund.'"  American Ad Mgmt., 190 F.3d at 1059 (quoting Eagle v. Star-

2   Kist Foods, Inc., 812 F.2d 538, 542 (9th Cir. 1987)).  Defendants briefly assert that a duplicative

3   recovery "is a near certainty" given that the Direct Purchasers' claims also are before the Court.

4   (Mot. at 16.)  Such a concern, however, generally is inapposite in the context of indirect purchaser

5   state law antitrust claims.  "States … which have repealed Illinois Brick and allowed indirect

6   purchasers to sue for antitrust violations, have necessarily made the policy decision that duplicative

7   recovery may permissibly occur.  Duplicative recovery is, in many if not all cases alleging a

8   nationwide conspiracy with both direct and indirect purchaser classes, a necessary consequence

9   that flows from indirect purchaser recovery.  Accordingly, it is no bar against standing, and this

10  factor does not weigh against standing."  DRAM II, 516 F. Supp. 2d at 1094.  In any event, the

11  Court notes that Plaintiffs have alleged that the alleged overcharges by Defendants are distinct and

12  traceable.  (IP Compl. ¶¶ 152-57.)  In such instances, courts have acknowledged that the risk of

13  duplicative recovery is less of a concern.  TFT-LCD, 586 F.Supp.2d at 1124; GPU II, 540 F. Supp.

14  2d at 1098.

15      At bottom, the Court concludes that Plaintiffs' allegations are sufficient to establish

16  standing at this stage of the pleadings for the California, Iowa and Nebraska Plaintiffs to pursue

17  their antitrust claims.[14]

18      **C.   CONSUMER PROTECTION CLAIMS**

19      The next issue for the Court's consideration is Defendants' contention that Plaintiffs have

20  failed to a state claim based on the consumer protection statutes of Arkansas, the District of

21  Columbia, Hawaii, Kansas, Maine, New Hampshire, New Mexico, New York, Rhode Island and

22  West Virginia.  (Mot. at 17.)  As will be discussed below, the Court agrees with Defendants'

23  motion, in part, and dismisses with prejudice Plaintiffs' claims under the laws of Kansas, Maine,

24  Rhode Island and West Virginia.  The Court also dismisses Plaintiffs' claims under the laws of the

25  District of Columbia, Hawaii, New Hampshire, New Mexico and New York, but grants leave to

26

27          [14] As noted, Defendants have not demonstrated that AGC applies to Plaintiffs' antitrust
     claims based on the laws of Arizona, Kansas, Maine, Michigan, North Carolina, South Dakota,
     Mississippi, Nevada, New Mexico, West Virginia and Wisconsin, and they have not advanced any
28   other ground for dismissing these particular claims at this time.

amend to correct the deficiencies, as explained below.  The motion to dismiss is denied as to

Plaintiffs' consumer protection claims based on the law of Arkansas.

                **1.**     **Arkansas**[15]

The Arkansas Deceptive Trade Practices Act ("ADTPA"), Arkansas Code §§ 4-88-101, *et*

*seq.*, prohibits "[d]eceptive and unconscionable trade practices," including "[e]ngaging in any other

*unconscionable*, false, or deceptive act or practice in business, commerce, or trade…."  Id. § 88-

107(a)(10) (emphasis added); see also id., § 4-88-108 (prohibiting deception, fraud and false

pretense).  While there appear to be no published state appellate rulings directly on point, Arkansas

courts have construed the statute broadly.  E.g., State ex rel Bryant v. R & A Inv. Co., 985 S.W.2d

299, 302-303 (Ark. 1999) (usury scheme constituted "unconscionable" conduct).  In addition,

several district courts interpreting the ADTPA have found that the term "unconscionable trade

practices" is sufficiently broad to encompass price fixing.  See In re Chocolate Confectionary

Antitrust Litig., -- F.Supp.2d --, 2009 WL 560601 at *27 (M.D. Pa. March 4, 2009) ("Chocolate

Confectionary") (conspiracy to fix and stabilize chocolate confectionary prices); In re New Motor

Vehicles Canadian Export Antitrust Litig., 350 F. Supp. 2d 160, 178 (D. Me. 2004) ("NMV")

(conspiracy to keep Canadian-manufactured vehicles from entering the U.S. automobile market).

Relying on a footnote in NMV, 350 F. Supp. 2d at 178 n.22, Defendants contend that the

district court rejected "the very same theory of deception – the failure to disclose an alleged

conspiracy – that Plaintiffs espouse in this case."  (Reply at 17.)  That contention lacks merit.

Though the Complaint alleges that Defendants acted in a "deceptive" manner "to cover up their

illegal acts," the pleadings also allege that Defendants engaged in "unconscionable conduct" by

misleading the public into believing that the prices they were paying for NAND flash memory

were set by the free market when, in fact, they were not.  (IP Compl. ¶ 208e.)  Moreover, the

footnote cited by Defendants does not pertain to the ADTPA, but rather, refers generally to state

consumer protection statutes that prohibit only "fraudulent or deceptive conduct."  NMV, 350 F.

---

[15] Defendants do not specifically address the consumer protection laws of Arkansas, the District of Columbia or New Mexico, but present a single argument that each of these three jurisdictions requires a showing of unequal bargaining power.  (Mot. at 17; Reply at 17.)  Because the statutes of each of these jurisdictions differ, the Court addresses each separately.

1  Supp. 2d at 177 n. 22.

2        Defendants also urge the Court to follow Judge Alsup's ruling in <u>GPU I</u> where he found

3  that plaintiffs' failure to plead "grossly unequal bargaining power" was fatal to their claims based

4  on the consumer protection laws of Arkansas, among other states.  527 F. Supp. 2d at 1029-1030.

5  This Court does not find the analysis set forth in <u>GPU I</u> to be pertinent to the issue presented

6  herein, particularly in light of the Arkansas Supreme Court's view that an unconscionable act is

7  one that is "an act that 'affronts the sense of justice, decency, or reasonableness,'" including acts

8  "*violative of public policy or a statute*."  <u>Baptist Health v. Murphy</u>, 226 S.W.3d 800, 810-11 (Ark.

9  2006) (emphasis added).  Here, Plaintiffs allege specifically that "Defendants' conduct with regard

10 to the sales of NAND Flash Memory, including their illegal conspiracy to secretly fix the price of

11 NAND Flash Memory at supracompetitive levels and overcharge customers, was substantively

12 unconscionable because it was one-sided and unfairly benefitted Defendants at the expense of

13 Plaintiffs and the public."  (IP Compl. ¶ 208f.)  Such allegations, construed in favor of Plaintiffs,

14 can be considered to constitute a violation of public policy.  For these reasons, Defendants' motion

15 to dismiss Plaintiffs' ADTPA claim is DENIED.

16              **2.**      **District of Columbia**

17       The District of Columbia's Consumer Protection Practices Act ("DCCPPA"), D.C. Code

18 § 28-3901, is intended to "assure that a just mechanism exists to remedy all improper trade

19 practices and deter the continuing use of such practices…."  D.C. Code § 28-3901(b)(1).  The Act

20 "defines its terms comprehensively so that it can provide a remedy for all improper trade

21 practices."  <u>Cooper v. First Government Mortg. & Investors Corp.</u>, 206 F. Supp. 2d 33, 35 (D. D.C.

22 2002); <u>Dist. Cablevision Ltd. v. Bassin</u>, 828 A.2d 714, 723 (D.C. 2003) (purpose of DCCPPA is

23 "to remedy all improper trade practices").

24       Without citing any case law specifically interpreting the DCCPPA, Defendants posit that

25 price-fixing is not the type of conduct within the reach of the statute.  (Mot. at 18.)  In fact, District

26 of Columbia courts have held that the DCCPPA proscribes the imposition of prices that are

27 "unconscionably high," i.e., prices that are "unreasonably favorable" to the seller, where "the buyer

28 did not have a meaningful choice of alternatives under the circumstances."  <u>Ford v. Chartone, Inc.</u>,

908 A.2d 72, 90 (D.C. 2006); <u>Chocolate Confectionary</u>, 2009 WL 560601 at *28 ("the DCCPPA subsumes a Sherman Act claim and creates an indirect purchaser cause of action for conspiratorial price fixing regardless of whether defendants have engaged in deceptive conduct.") (citing D.C. state case law).

With respect to their claims under the DCCPPA, Plaintiffs alleges that they paid "artificially inflated prices" for NAND flash memory as a result of Defendants' alleged suppression and elimination of price competition.  (IP Compl. ¶ 210e.)  Absent, however, are allegations that Plaintiffs were charged "unconscionably high" prices that were unreasonably favorable to the seller, resulting from a lack of meaningful choice of alternatives under the circumstances.  <u>Ford</u>, 908 A.2d at 90.  As a result, the Court finds that Plaintiffs' claims under the DCCPPA are deficient and GRANTS Defendants' motion to dismiss Plaintiffs' claims under the DCCPPA.  Because this deficiency could be cured by amendment, Plaintiffs will be granted leave to amend to include the requisite factual allegations as discussed above.

### 3.   Hawaii

Plaintiffs bring a consumer protection claim under Hawaii's Antitrust Act, Hawaii Rev. Stat. §§ 480 *et seq.*  (Compl. ¶ 212e).  Citing Hawaii Rev. Stat. § 480.13-3, Defendants argue that such a claim is not ripe given the requirement that Plaintiffs must first provide the state attorney general the opportunity to prosecute the claim on their behalf.  (Mot. at 19.)

Section 480-2 prohibits (1) "unfair methods of competition" and (2) "unfair or deceptive acts or practices."  Hawaii Rev. Stat. § 480-2(a), (d) and (e).  Under section 480.13-3(a)(1), "[a] class action for claims for a violation of this chapter *other than* claims for *unfair or deceptive acts or practices* may be filed, and may be prosecuted on behalf of indirect purchasers by a person other than the attorney general," provided that the class plaintiffs first serve a copy of the complaint on the attorney general.  The attorney general has sole discretion as to whether the state will proceed with the action or file its own action.  <u>Id.</u>, § 480.13(a)(4).  If the attorney general declines to so proceed, the class plaintiff shall have the right to proceed with the action.  <u>Id.</u>, § 480.13(a)(5)(C).  Subdivision (b) states that "[t]his section shall not limit the rights of consumers to bring class actions against any person based on unfair or deceptive acts or practices declared unlawful by

section 480-2."

Plaintiffs acknowledge that *unfair competition* claims *are* subject to the attorney general notification requirement, but contend that their claim for *unfair or deceptive acts* should be allowed to proceed.  (Opp. at 43.)  As Defendants point out, the flaw in that argument is that the Complaint alleges *both* grounds as a basis for recovery in a single claim.  (IP Compl. ¶ 212(e).)  To the extent Indirect Plaintiffs desire to pursue a claim under Hawaii law, they will need to expressly limit their claim to the unfair and deceptive acts aspect of the Hawaii Antitrust Act.  Consequently, Defendants' motion to dismiss as to Plaintiffs' claim based on section 480-2 is GRANTED. Plaintiffs will be allowed leave to amend to allege a claim for unfair or deceptive acts or practices only.

### 4.    Kansas

Plaintiffs do not oppose dismissal of their claims under the Kansas Consumer Protection Act, Kan. Stat. §§ 50-623, et seq.  (Opp'n at 40 n.43.)  Therefore, Defendants' motion to dismiss Plaintiffs' claim under Kansas law is GRANTED, which is dismissed without leave to amend.

### 5.    Maine

The Maine Unfair Trade Practices Act ("MUTPA") prohibits "unfair methods of competition" as well as "unfair or deceptive ... conduct of any trade."   Me. Rev. Stat. Ann. tit. 5 §207 (Me. 2008).  The Maine Supreme Court has held that "[i]n pricing cases under the Act the inquiry is whether the price has the effect of deceiving the consumer, or inducing her to purchase something that she would not otherwise purchase."  Tungate v. MacLean-Stevens Studios, Inc., 714 A.2d 792, 797 (Me. 1998).  Applying this standard, the Court concurs with Defendants that the MUTPA does not create a cognizable claim for collusive pricing.  Logically, charging *higher* prices would not deceive or induce a consumer to purchase an item he or she would not otherwise purchase.  See GPU I, 527 F. Supp. 2d at 1031 ("[a]rguing that higher prices induced consumers to make purchases simply does not make sense."); accord Chocolate Confectionary, 2009 WL 560601 at *29; TFT-LCD, 586 F. Supp. 2d at 1126.

In an attempt to distinguish Tungate, Plaintiffs argue that its holding applies *only* to the portion of the MUTPA that pertains to claims based on "unfair and deceptive acts," and does not

address the standard for claims based on "unfair methods of competition."  (Opp'n at 44.)  In support of their position, Plaintiffs cite NMV, where the court narrowly construed the Tungate court's holding as applying only to the MUTPA's restriction on "unfair or deceptive acts."  NMV, 350 F. Supp. 2d at 187 n.40.  The Court disagrees with the NMV court's restrictive reading of Tungate.  By its own terms, the Tungate standard applies broadly to "pricing cases *under the Act*." 714 A.2d at 797 (emphasis added).  There is nothing in Tungate to support the purported distinction advocated by Plaintiffs.  As a decision of Maine's highest court, the Court is bound to follow the holding in Tungate.  See Carpenter, 540 F.3d at 963.  In accordance with Tungate, the Court GRANTS Defendants' motion to dismiss Plaintiff's claim under the MUPTA.  Because any amendment would be futile, said dismissal is without leave to amend.

### 6.    New Hampshire

Defendants move to dismiss Plaintiffs' claim under New Hampshire Consumer Protection Act ("CPA"), N.H. Rev. Stat. § 358-A:2, on the ground that Plaintiffs have not alleged that any unfair or deceptive acts took place *within* New Hampshire.  See Pacamor Bearings, Inc. v. Minebea Co., Ltd., 918 F. Supp. 491, 504 (D.N.H. 1996) (CPA requires that "offending conduct" occur within the state's borders).  Though Plaintiffs acknowledge that their Complaint lacks such allegations, they briefly contend that the CPA should be read broadly in light of LaChance v. U.S. Smokeless Tobacco Co., 931 A.2d 571, 580 (N.H. 2007).  (Opp'n at 44.)  LaChance merely states that "indirect purchasers may bring claims under the CPA."  Id. at 575.  It does not, as Plaintiffs suggest, address the requirement that the offending conduct occur within the state.  Given Plaintiffs' failure to state a cognizable claim under the CPA, the Court GRANTS Defendants' motion to dismiss this claim, with leave to amend to cure the deficiency if Plaintiffs are able to do so in good faith.

### 7.    New Mexico

The New Mexico Unfair Practices Act ("NMUPA"), New Mexico Stat. §§ 57-12-1, *et seq.,* prohibits both "unfair deceptive trade practices" and "unconscionable trade practices in the conduct of any trade or commerce."  N.M. Stat. Ann. § 57-12-3.  Under New Mexico law, an unconscionable trade practice is "an act or practice . . . which to a person's detriment: (1) takes

advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) results in a gross disparity between the value received by a person and the price paid." N.M.Rev.Stat. § 57-12-2(E); NMV, 350 F. Supp. 2d at 195-96.

Defendants contend, without citation to relevant authority, that "unconscionable trade practices" is limited to cases where "grossly unequal bargaining power" is alleged. (Mot. at 17.) Courts have taken a broader view of the NMUPA, however. "Federal courts generally permit NMUPA actions in price-fixing cases provided that the plaintiff alleges a 'gross disparity' between the price paid for a product and the value received." Chocolate Confectionary -- F. Supp. 2d at --, 2009 WL 560601 at *29 (citing cases); TFT-LCD, 586 F. Supp. 2d at 1127. Nevertheless, Plaintiffs' Complaint does not contain the requisite allegations, even under a more expansive reading of the statute. The Complaint simply alleges that "[t]here was a gross disparity of *bargaining power* between the parties with respect to the price charged by Defendants and NAND flash memory," (IP Compl. ¶ 218(c) (emphasis added).) "Gross disparity" between the *price paid for a product and the value received* is *not* alleged. Given the absence of the requisite allegations, the Court GRANTS Defendants' motion to dismiss Plaintiffs' NMUPA claim. Plaintiffs will be allowed leave to amend to cure this deficiency.

### 8. New York

Section 349 of New York's General Business Law provides, in relevant part, that: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." "[S]ection 349 is directed at wrongs against the consuming public." See In re Rezulin Prods. Liab. Litig., 392 F. Supp. 2d 597, 614 (S.D.N.Y. 2005) ("Rezulin"); e.g., New York v. Feldman, 210 F. Supp. 2d 294, 302 (S.D.N.Y. 2002) ("The antitrust violations alleged in the Complaint constitute the kind of deceptive acts and practices contemplated by section 349."). A plaintiff asserting a section 349 claim "must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." See Stutman v. Chem. Bank, 95 N.Y.2d 24, 29 (2000).

Defendants contend that Plaintiffs' cause of action under section 349 fails on the ground

that there is no particular conduct directed specifically *at the Indirect Purchasers*.  (Mot. at 20.)  In Paltre v. General Motors Corp., the court held that consumers who purchased or leased vehicles "failed to set forth a viable cause of action to recover damages for deceptive business practices" based on allegations of price-fixing among automobile manufacturers "because the alleged misrepresentations were either not *directed at consumers* or were not materially deceptive."  See Paltre v. General Motors Corp., 810 N.Y.S. 496, 498 (N.Y. App. Div. 2006) (emphasis added); accord Rezulin, 392 F. Supp. 2d at 614.  Here, the Complaint only avers that Defendants "publicly provided pretextual and false justifications" for their price increases and made "public announcements concerning the changes in the prices of NAND Flash Memory."  (IP Compl. ¶ 219c.)  Other than the supposed statements made to the "public," there are no specific allegations that the misconduct was directed *at* any particular group, let alone Indirect Purchasers in New York.

Plaintiffs fail to address Paltre.  Instead, they simply assert that a section 349 claim is sustainable where the deceptive conduct is directed at a "broad group of individuals."  (Opp'n at 45.)  That argument misses the mark.  The question presented is not whether anticompetitive conduct falls within the purview of section 349.  Rather, the issue framed by Defendants' motion is whether the misrepresentations were directed *at* Indirect Purchasers of NAND flash memory.  Such allegations are absent from the pleadings, which aver only that Defendants made "public announcements" intended to create the illusion of free market pricing.  (IP Compl. ¶ 219c.)[16]  As such, the Court GRANTS Defendants' motion to dismiss.  Plaintiffs are granted leave to amend to cure this deficiency.

### 9.    Rhode Island

Defendants move to dismiss Plaintiffs' claim under Rhode Island's Unfair Trade Practices and Consumer Protection Act ("UTPCPA"), R.I. Gen. Laws § 6-13.1-1, *et seq,*. on the ground that price fixing does not constitute "[u]nfair methods of competition and unfair or deceptive acts or

---

[16] Although Plaintiffs contend that they, in fact, have made the requisite allegations, the cited paragraphs of the Complaint do not support their assertion.  (Opp'n at 46 (citing Compl. ¶¶ 174, 219.)

practices" as defined by the UTPCPA.  (Mot. at 22.)  Section 6-13.1-2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  To determine whether a practice is "unfair" under the statute, the court is to consider:  "(1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen)."  See Ames v. Oceanside Welding and Towing Co., Inc., 767 A.2d 677, 681 (R.I. 2001) (internal quotation and citations omitted).

The Court concurs with Defendants that price fixing is not within the ambit of the UTPCPA.  The statute defines "unfair methods of competition and unfair or deceptive acts or practices" to consist of 19 separately enumerated practices, *none of which includes price fixing.* R.I. Gen. Laws §§ 6-13.1-1(6)(i)-(xix).   In ERI Max Entertainment, Inc. v. Streisand, 690 A.2d 1351, 1354 (R.I. 1997), a video store owner sued Blockbuster Video ("Blockbuster") and Barbra Streisand (among others) for violating the state's antitrust and unfair practices statutes.  The store's claim was based on an agreement in which Blockbuster was granted exclusive access to a Streisand concert video containing an extra song not found on versions of the videotape distributed elsewhere.  In rejecting plaintiff's unfair competition claims, the Rhode Island Supreme Court explained that "a finding of unfair competition must be predicated upon conduct on the part of the respondent that reasonably tended to confuse and mislead the general public into purchasing his product when the actual intent of the purchaser was to buy the product of the complainant."  Id. at 1353-54.  The court then concluded that the defendants' exclusive distribution agreement was not the type of "unfair conduct" that the Act was intended to encompass.  Id.  It is clear under the foregoing authority, which is binding on this court, the "price fixing conspiracy" alleged in this

1  case (IP Compl. ¶ 221c) is not governed by the UTPCPA.[17]  For these reasons, the Court GRANTS

2  Defendants' motion to dismiss.  Because any amendment to this claim would be futile, such

3  dismissal is without leave to amend.

4      **10.**  **West Virginia**

5     Defendants argue that Plaintiffs' claim under the West Virginia Consumer Credit and

6  Protection Act (the "WVCCPA"), W.V. Code § 46A-6-101, *et seq.*, should be dismissed because

7  the statute does not encompass price fixing.  (Mot. at 23.)  The WVCCPA states, in part, that:

8  "The legislature hereby declares that the purpose of this article is to complement the body of

9  federal law governing unfair competition and unfair, deceptive and fraudulent acts or practices in

10  order to protect the public and foster fair and honest competition.  It is the intent of the legislature

11  that, in construing this article, the courts be guided by the interpretation given by the federal courts

12  to the various federal statutes dealing with the same or similar matters.  To this end, this article

13  shall be liberally construed so that its beneficial purposes may be served."  W. Va.Code § 46A-6-

14  101(1).

15     Seizing upon the state legislature's directive that the WVCCPA be "liberally construed,"

16  Plaintiffs contend that the statute should be read to encompass price fixing.  (Opp. at 47.)  The

17  Court disagrees.  Price fixing is not among the 16 enumerated definitions of "[u]nfair methods of

18  competition and unfair or deceptive acts or practices[.]"  W. Va. Code, § 46A-6-102.  Rather, on

19  their face, each of these definitions pertains to misrepresentations or deceptive practices relating to

20  goods and services.  For example, the statute prohibits acts such as "[p]assing off goods or services

21  as those of another"; "[u]sing deceptive representations or designations of geographic origin in

22  connection with goods or services"; "[m]aking false or misleading statements of fact concerning

23  the reasons for, existence of or amounts of price reductions"; and "[e]ngaging in any other conduct

24  which similarly creates a likelihood of confusion or of misunderstanding."  Id.  In short, price

25

26     [17] Aggrieved purchasers are not without a remedy, as the Defendants' actions may be subject to the state's antitrust provisions.  R.I. Gen. Laws § 6-36.2(b).  However, indirect purchasers lack standing to bring a private claim under that statute.  See Siena v. Microsoft Corp.,

27  796 A.2d 461, 464-65 (2002) (holding that the state attorney general has standing as *parens patriae* to protect the rights of indirect purchasers in antitrust matters since they cannot bring such actions

28  themselves directly).

1  fixing or similar anticompetitive conduct cannot be reasonably construed to fall within the scope of

2  the WVCCPA.  See TFT-LCD, 586 F. Supp. 2d at 1130 (WVCCPA does not include price fixing

3  schemes); GPU, 527 F. Supp. 2d at 1030 (same); DRAM I, 516 F. Supp. 2d at 1119 (same).

4       Plaintiffs' reliance on Federal Trade Comm'n v. Mylan Labs, Inc., 62 F. Supp. 2d 25

5  (D.D.C.), on recons., 99 F. Supp. 2d a, 10 (D.D.C. 1999) and In re Pharmaceutical Industry

6  Average Wholesale Price Litig., 223 F.R.D. 229, 231 (D. Mass. 2006) is misplaced.  (Opp'n at 47.)

7  While both cases support the general notion that indirect purchaser cases may be brought under the

8  WVCCPA, neither stands for the proposition that the provision of the WVCCP at issue "justifies

9  allowing allegations of antitrust price-fixing brought by indirect purchasers to go forward."  Id.

10  Accordingly, the Court GRANTS Defendants' motion to dismiss Plaintiffs' WVCCPA claim.

11  Since amendment to this claim would be futile, said dismissal is without leave to amend.

12      **D.**    **UNJUST ENRICHMENT CLAIMS**

13       Finally, Defendants move to dismiss Plaintiffs' unjust enrichment claims under the laws of

14  Arizona, Florida, Massachusetts, Minnesota, New Hampshire, North Carolina and Tennessee.

15  They argue that the laws of each of these states "bar an action for unjust enrichment where the

16  plaintiff has an adequate remedy at law."  (Mot. at 24.)  As a general principle, Defendants are

17  correct that "[i]t is a basic doctrine of equity jurisprudence that courts of equity should not act ...

18  when the moving party has an adequate remedy at law ...."  Mort v. United States, 86 F.3d 890, 892

19  (9th Cir. 1996); see also Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 75-76 (1992)

20  ("it is axiomatic that a court should determine the adequacy of a remedy in law before resorting to

21  equitable relief").  In response, Plaintiffs contend that they are allowed under the Federal Rules to

22  allege claims in the alternative, even if they are inconsistent with one another.  See Fed. R. Civ.

23  Pro. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of

24  consistency.").

25       The difficulty for the Court is that neither party focuses on the appropriate issue.  The laws

26  governing claims for unjust enrichment vary from state to state.  "[S]ome states recognize unjust

27  enrichment as a separate free-standing claim, while others do not."  GPU II, 540 F. Supp. 2d at

28  1100.  Instead of analyzing the laws of each state separately, Defendants relegate their discussion

1   to a string cite contained in a footnote in their moving papers.  (Mot. at 24 n.9.)[18]  The lack of

2   individualized analysis by the parties is unhelpful.  For example, Defendants cite <u>Community</u>

3   <u>Guardian Bank v. Hamlin</u>, 182 Ariz. 627, 630 (Ariz. Ct. App. 1995) for the proposition that an

4   unjust enrichment claim "requires that there be no remedy provided at law."  (Mot. at 24 n.9.)

5   More recent Arizona authority, on the other hand, suggests that the "adequate remedy at law"

6   requirement turns not on whether the plaintiff has a remedy "providing all the relief the party

7   desires," but rather, on "whether there is a contract which governs the relationship between the

8   parties."  <u>Trustmark Ins. Co. v. Bank One, Arizona, NA</u>, 202 Ariz. 535, 541 n.5 (2002).

9          The Court declines to independently address the viability of Plaintiffs' unjust enrichment

10  claims with respect to the aforementioned states.  In the event Defendants desire to seek a judicial

11  resolution of this issue, they should discuss the laws of each state separately.  Such analysis should

12  be supported with citations to relevant authorities demonstrating that Plaintiffs cannot, as a matter

13  of law, maintain a separate claim for unjust enrichment where they, at the same time, are pursuing

14  claims based on state antitrust and consumer protection statutes.  For these reasons, Defendants'

15  motion to dismiss Plaintiffs' unjust enrichment claims under the laws of Arizona, Florida,

16  Massachusetts, Minnesota, New Hampshire, North Carolina and Tennessee is DENIED without

17  prejudice.

18         **E.      LACK OF A REPRESENTATIVE PLAINTIFF**

19         Defendants move to dismiss Plaintiffs' second, third and fourth claims for relief to the

20  extent that such claims are based on the laws of a state where no representative has been named; to

21  wit, Alabama, Arizona, Mississippi, Nebraska, Nevada, Hawaii and New Hampshire.  (Mot. at 16.)

22  "A class cannot assert a claim on behalf of an individual that they do not represent."  <u>GPU I</u>, 527 F.

23  Supp. 2d at 1026; <u>accord</u> <u>In re Ditropan XL Antitrust Litig.</u>, 529 F. Supp. 2d 1098, 1106-107 (N.D.

24  Cal. 2007).  Where, as here, a representative plaintiff is lacking for a particular state, all claims

25  based on <i>that</i> state's laws are subject to dismissal.  <u>Id.</u>

26         Plaintiffs concede that they lack representatives for claims predicated on the laws of each of

27  _____

    [18] The bulk of Plaintiffs' argument also is set forth in a lengthy string cite in a footnote.
28  (Opp'n at 48 n.47.)

1   the aforementioned states.  However, they request leave to amend to join a class representative for

2   each of those states, except as to Alabama.  Defendants argue that allowing the joinder of

3   additional plaintiffs should be disallowed as futile on the ground that Plaintiffs lack standing.  As

4   discussed, the Court has concluded that Plaintiffs have alleged sufficient facts to establish standing

5   with respect to their state law antitrust claims, and certain of their consumer protection claims may

6   be viable upon proper amendment.  The proposed amendment to join the missing representatives,

7   therefore, would not be entirely futile.  The Court thus GRANTS Defendants' motion to dismiss as

8   to Plaintiffs' second, third and fourth claims under the laws of Alabama, Arizona, Mississippi,

9   Nebraska, Nevada, Hawaii and New Hampshire.  Plaintiffs are granted leave to amend to join

10  representative class members to the extent their joinder is consistent with this Order.

11      **F.   MISCELLANEOUS REQUESTS**

12          Several of the parties have filed requests for judicial notice ("RJN").  (Docket 399, 448,

13  419, 377.)  All requests are unopposed, except for the RJN filed by Hynix Semiconductor America,

14  Inc. ("Hynix") (Docket 377), to which the Indirect Purchaser Plaintiffs have filed an objection

15  (Docket 400).  The unopposed RJNs are GRANTED.  As to Hynix's RJN, the Court's ruling does

16  not rely on any of the materials submitted therein.  Therefore, Hynix's RJN is DENIED AS MOOT

17  and Indirect Purchaser Plaintiffs' objections are OVERRULED AS MOOT.

18          Direct and Indirect Purchaser Plaintiffs also filed a motion for administrative relief in which

19  they submit copies of three district court decisions that were rendered following the scheduled

20  hearing date on the motions to dismiss.  (Docket 454). The Court finds that under the

21  circumstances, the submission of these authorities is authorized and appropriate under Local Rules

22  7-3(d) and 7-11, and as such, the motion is GRANTED.

23          Finally, Defendants filed a motion for a protective order to stay discovery during the

24  pendency of the above-discussed motions to dismiss.  (Docket 379).  As the Court has now

25  resolved the motions, this motion is DENIED AS MOOT.

26  **V.   CONCLUSION**

27          For the reasons stated above,

28          IT IS HEREBY ORDERED THAT:

1.      Defendants' motion to dismiss (Docket 370, 371, 372, 373, 376, 382) the Direct Purchasers' Complaint is DENIED.

2.      Defendants' motion to dismiss the Indirect Purchasers' Complaint (Docket 374) is GRANTED IN PART and DENIED IN PART, as follows:

    a.      The motion to dismiss is DENIED as to Plaintiffs' state antitrust claims.

    b.      The motion to dismiss is DENIED as to Plaintiffs' claims under the consumer protection laws of Arkansas, and GRANTED as to Plaintiffs' claims under the consumer protection laws of the District of Columbia, Hawaii, Kansas, Maine, New Hampshire, New Mexico, New York, Rhode Island and West Virginia.  Plaintiffs are GRANTED LEAVE TO AMEND as to their claims under the laws of the District of Columbia, Hawaii, New Hampshire, New Mexico and New York.  Plaintiffs' consumer protection claims under the laws of Kansas, Maine, Rhode Island and West Virginia are DISMISSED WITH PREJUDICE.

    d.      The motion to dismiss is DENIED as to Plaintiffs' claim for unjust enrichment.

    e.      The motion to dismiss is GRANTED as to the Second, Third and Fourth Claims for Relief to the extent that Plaintiffs' claims are based on the laws of Alabama, Arizona, Mississippi, Nebraska, Nevada, Hawaii and New Hampshire, on the ground that Plaintiffs have failed to name a representative plaintiff.  Such claims are DISMISSED WITH LEAVE TO AMEND to join a proper representative plaintiff for each of those states (except Alabama), but only to the extent their joinder is consistent with this Order.

    f.      Plaintiffs shall have up to and including May 1, 2009 to file an amended complaint that corrects the deficiencies described in this Order.  Plaintiffs may not amend their Indirect Purchaser Complaint in any manner than specified herein.

3.      All unopposed requests for judicial notice (Docket 399, 448, 419) are GRANTED. Hynix's request for judicial notice (Docket 377) is DENIED AS MOOT and Indirect Purchaser Plaintiffs' objections thereto (Docket 400) are OVERRULED AS MOOT.

4.      Plaintiffs' motion for administrative relief to consider additional district court authorities (Docket 454) is GRANTED.

5.      Defendants' motion for a protective order staying discovery (Docket 379) pending the disposition of their motions to dismiss is DENIED AS MOOT.

6.      A Case Management Conference is scheduled for **May 20, 2009 at 3:00 p.m.** The parties shall meet and confer prior to the conference and shall prepare a joint Case Management Conference Statement which shall be filed no later than ten (10) days prior to the Case Management Conference that complies with the Standing Order for All Judges of the Northern District of California and the Standing Order of this Court.  Plaintiffs shall be responsible for filing the statement as well as for arranging the conference call.  All parties shall be on the line and shall call (510) 637-3559 at the above indicated date and time.

IT IS SO ORDERED.

Dated: March 31, 2009

_____
Honorable Saundra Brown Armstrong
United States District Court